Filed 9/1/23  P. v. Robinson CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E079032 |
| v. | (Super. Ct. No. FVA801386) |
| KELLY ROBINSON, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Cara D. Hutson, Judge.  Affirmed.

Shay Dinata-Hanson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Lynne G. McGinnis and Susan Elizabeth Miller, Deputy Attorneys General, for Plaintiff and Respondent.

1

I.

INTRODUCTION

Defendant and appellant Kelly Robinson appeals from the trial court's order denying his petition to vacate his attempted murder conviction and for resentencing under Penal Code[1] section 1172.6 (formerly section 1170.95).[2] On appeal, defendant argues the trial court erred in summarily denying his petition because the record of conviction suggested his allegations had potential merit. We conclude that the instructions did not permit the jury to find defendant guilty of attempted premediated murder without finding that he personally acted with malice aforethought. We thus affirm the trial court's order.

II.

FACTUAL AND PROCEDURAL BACKGROUND[3]

The shooting occurred in the early morning hours of July 31, 2008, in the driveway of the residence of David Martin and Sharon Martin at 14221 Remington Court in Fontana. Remington Court is a short street, terminating in two cul-de-sacs, and

---

[1] All future statutory references are to the Penal Code.

[2] Effective June 30, 2022, the Legislature renumbered section 1170.95 as section 1172.6, with no substantive change in text. (Stats. 2022, ch. 58, § 10.) We cite to section 1172.6 for ease of reference unless otherwise indicated.

[3] The factual background is taken verbatim from this court's nonpublished opinion in defendant's direct prior appeal, case No. E055003. (*People v. Robinson* (Nov. 26, 2013, E055003) [nonpub. opn.] (*Robinson I*).) After considering the People's request for judicial notice of the records from defendant's direct appeal in case No. E055003 and defendant's opposition, we took judicial notice of the prior appeal in case No. E055003.

2

intersecting with East Lincoln Loop Road.  Evidence reflected the shooting occurred because of rivalry between the HG and NAW gangs.

A. *Testimony of McGraw*

Joseph McGraw was visiting his sister, Sharon Martin.[4]  After midnight on July 31, 2008, McGraw and his sister's husband, David Martin, were in the garage smoking cigarettes.  When Sharon saw a man with a gun, she called the police and the Martins and McGraw moved out of the garage to the driveway.  McGraw was shot as he was standing by David and tried to take cover under a vehicle.  McGraw could not identify the shooter.

Dr. Paul Burton, an orthopedic surgeon, testified that McGraw sustained an abdominal injury to the pancreas, a gunshot wound to the flank, and an open fracture to the elbow.  McGraw's injuries required two surgeries and the insertion of permanent plates in his elbow.

B. *Testimony of Sharon Martin*

Sharon testified that, in July 2008, she lived with her husband and children but her 18-year-old son, Tyson, had moved out in June after his high school graduation.  When she went to bed on July 30, McGraw was not inside the house.  At 1:00 a.m. on July 31, Sharon woke up because McGraw was loud and intoxicated.  When she looked out the window, she saw four men walking toward Liberty Loop Road, away from the Remington Court cul-de-sac.  Sharon told David that one of the men, codefendant

---

[4]  The Martins also use the surname Salter.  Sharon had a 2007 perjury conviction for using a false driver's license.

3

Gregory Atkins, was carrying a gun. She called the police because she thought it might be related to a custody dispute involving David's daughter. Sharon followed David toward the cul-de-sac where he was talking to the men down the street. He yelled at them to "get out of here." Sharon was able to see codefendant Atkins.

About 10 minutes passed. While waiting for the police, the Martins and McGraw continued talking and smoking in the garage, before moving to the driveway. At that point, the neighbor's motion light activated. David pushed Sharon on the ground as gunshots were fired. Sharon glimpsed a man wearing the same dark-colored shirt as codefendant Atkins. She testified that Atkins was the shooter. McGraw yelled that he had been shot and Sharon ran upstairs to check on her children.

Afterwards, Sharon did not want to talk to the police because she was concerned about the danger to her family. Although she did not tell the police about recognizing codefendant Atkins, she did tell them she saw one suspect fleeing in a gray SUV. She identified codefendant Atkins from a photographic lineup. She decided to cooperate with the police after her husband planned to surrender to custody and she had been frightened by a street encounter with codefendant Atkins.

Sharon did not recall that Atkins had been friends with her son, Tyson. She denied that Tyson was involved in gangs. Since the shooting incident, her family experienced problems and had to relocate to a new home and schools. She acknowledged that David Martin had been a Du-Roc Crips gang member.

4

C. *Testimony of David Martin*

David Martin testified that, when Sharon told him she had seen some men, one of whom was armed, he walked up the street to check it out. Sharon tried to stop him because she preferred to call the police to handle it. David saw four men, wearing dark colors and hoodies, walking toward the cul-de-sac. The men turned and faced him from a distance of about five feet and he recognized them from previous contacts as defendant, codefendant Atkins, Ranson Barrett Sparrow, and Jakeen Morgan. Defendant and Atkins were in front and the other two were behind them.

David said Tyson "socializes" with the NAW gang. Defendant, Atkins, and Sparrow had been friends with Tyson in high school in 2007. David had seen defendant at the Martin house and in the park playing basketball where David had smoked marijuana with defendant. Morgan was also in school with Tyson. A couple of days before this incident there had been a shooting nearby involving David's daughter.

David asked the four men what they were doing and defendant asked for Tyson. David told him Tyson was not living there. When David said Sharon had called the police and the men should leave, they started to walk away. Defendant raised his shirt and displayed the butt of an automatic gun in his waistband.

After following the men, David returned to his house where Sharon and McGraw, who was drunk, were arguing in the driveway and waiting for the police. When the neighbor's motion detector lights activated, David saw the four men emerge from behind another house. Defendant and Atkins began firing guns. David shoved Sharon down and

5

squatted behind a vehicle.  The gunshots hit their vehicles and the house.  McGraw was wounded.  Defendants ran off and fled in an SUV.

When David was first interviewed by the police, he did not cooperate because he was about to serve a one-year jail sentence for a 2008 robbery conviction[5] and he thought he would not be able to protect his family if he testified.  He decided to testify after a threatening encounter with Atkins and Sparrow.  In August 2008, he identified defendant, Atkins, Sparrow, and Morgan in photographic lineups.  David testified that defendant and Atkins had the guns and were the shooters.

David admitted he was formerly a gang leader with the Du-Rock Crips gang with a 25-year association.  He had been involved in violence and a victim of three shootings.  He testified it was against the rules of the gang to cooperate with the police.  Instead, the gang would engage in retaliation.  A person in custody was in danger if he was labeled a snitch or a rat.  In October 2008, the four men who had been involved in the shooting threatened David while they were all incarcerated.  They yelled at him and called him a snitch.  Atkins asserted he was from "Palmer Blocc" and "HG."  Defendant called David an "OG," meaning an older gangster.  David was more concerned about his family's safety than his own.  Other people had threatened him about testifying and his family had to relocate.

In cross-examination, David admitted having testified at the preliminary hearing that he first heard about the men walking by from Sharon when he was upstairs playing a

---

[5]  David also admitted he had a 1997 felony conviction for burglary.

6

game. He was not sure whether she said one of the men had a gun. There were numerous inconsistencies between David's testimony at trial, at the preliminary hearing, and in various other statements he made to the police, particularly about who was armed during the shooting.

D. *Other Prosecution Evidence*

The first officer on the scene, Casey Mutter, heard gunshots as he approached the location and was flagged down by David Martin. McGraw was on the ground bleeding. Martin said the assailants had run away in a northeastern direction between two houses. Martin was upset and uncooperative. He said he could not identify the assailants because he had dived for cover. Sharon Martin told Mutter she was inside the house when she heard several gunshots and she saw four men run to a gray SUV and speed away. She was not forthcoming about other details. Mutter did not observe an SUV leaving the scene.

Police Sergeant Thomas Yarrington also responded to the report involving four Black males and a gun. As Yarrington approached Remington Court, he heard five gunshots in rapid succession. In less than one minute, he drove to the scene where it was chaotic with lots of yelling. McGraw was coherent but moaning. Both of the Martins were argumentative and uncooperative, consistent with the behavior of other witnesses in gang-related crimes. David said the shooters left in a silver or gray SUV. Sharon told the police she had observed four or five Black males and one was carrying a gun so she called 911. After she heard gunshots, they fled in a silver SUV or on foot.

7

On August 5, 2008, the Martins contacted a police detective, Cliff Ohler, to offer more information. David Martin continued to be uncooperative but he identified the four assailants as defendant, Atkins, Sparrow, and Morgan in photographic lineups. David did not mention defendant, who used the gang moniker of "Punches," having possession of a gun. David was fearful of retaliation.

On August 6, 2008, the detective learned defendant was staying with a gang member, Jason Wooten, who was affiliated with "HG"—Hustler Gang or Heritage Gang—and known as "Problem Child." Police arrested defendant after chasing him through a residential neighborhood and overcoming his resistance to being handcuffed.

In a recorded police interview, defendant initially said he had heard about a shooting but he denied being involved. He claimed he was at home on the night of the shooting. Defendant knew Sparrow and Morgan but he denied having any gang affiliations except with Pasadena Denver Lane Bloods. Defendant explained that "HG" refers to "Harry Glenn," a "dead homie." Defendant had "Punches" tattooed on his forearm. Later in the interview, defendant admitted being "HG" or "Hustler Gang." He said the shooting occurred because of retaliation and escalation among gang members. The people present were "Smooth" (Marquis Walker), Problem Child (Jason Wooten), and Jakeen Morgan, but not Sparrow. Only one person, Smooth or "Keese"[6] had a gun. Defendant claimed the NAW gang shot first and Smooth shot back in response. Defendant ducked when he heard the shooting and then began running.

---

[6] Keese could not be identified until later.

8

While searching Atkins's residence, police found a .45-caliber semiautomatic handgun, a box of .25-caliber ammunition, and a sock containing 13 or 14 rounds of .38-caliber ammunition. Atkins's stepdad claimed the gun belonged to him. There was gang graffiti, including the initials "HG" in one of the bedrooms, which was not occupied by Atkins.

E. *Gang Testimony*

A gang expert, Kellen Guthrie, testified about gang culture and practice. He was familiar with the HG gang, also known as Koehler Park Hustler. In July and October 2008, HG was an active gang with several members. HG is a rival gang with NAW. The primary activities of HG were attempted murder, assault with a deadly weapon, and robbery. Atkins and defendant were active HG members.

In May 2006, Craig Payne of HG was shot close to the Martin house by shooters yelling NAW. Marquis Walker, also known as Keese, was an HG member. Wooten, or Problem Child, was an HG member. Both Walker and Wooten had been victims of shootings.

In July 2008, HG was involved in a dispute over territory with NAW. The shooting at the Martin residence was directed at their absent son, Tyson, and the NAW gang. David Martin was a former Du-Roc gang member.

On March 10, 2010, the San Bernardino County District Attorney charged defendant and codefendant Gregory Atkins with three counts of attempted premeditated and deliberate murder of McGraw and David and Sharon Martin (§§ 187, subd. (a), 664;

9

counts 1-3) and dissuading a witness by force (§ 136.1, subd. (c)(1); count 4). It was further alleged that each offense was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1).) It was also alleged in counts 1 through 3 that defendant and Atkins personally used a firearm (§ 12022.53, subd. (b)), that they personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and that they personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)).

On March 12, 2010, a jury convicted defendant of one count of willful, premediated and deliberate attempted murder of McGraw with a gang enhancement (§§ 664/187, subd. (a), 186.22, subd. (b)(1)(C)) and acquitted him of the remaining counts. The jury did not find true the various firearm allegations. The court sentenced defendant to a prison term of seven years to life plus 10 years for the gang enhancement.

On November 26, 2013, this court affirmed the judgment. In doing so, we rejected defendant's arguments concerning the gang testimony, as well as instructional errors relating to aiding and abetting and other forms of instructional error. (See *Robinson I*, *supra*, *E055003*.)

On November 17, 2021, defendant filed a petition for resentencing pursuant to section 1172.6.

After appointing counsel and receiving briefing from the parties, the trial court held a hearing on May 13, 2022. The court summarily denied the petition, explaining as follows: "As I indicated, the Court said at the last hearing that I was inclined to grant the relief. However, I read Mr. Collins's motion or opposition and he cited the case of

10

*People versus Coley*, which is cited at 77 Cal.App 5th 539. And the Court is persuaded that under the facts of the Robinson case and the jury instructions given by the Court at that time, that *Coley* is squarely on point with the Court's jury instructions. Meaning that the Court neither gave the instructions pursuant to the felony murder rule nor any jury instructions where the jury could infer the natural and probable consequence doctrine, that it was only given the aiding and abetting jury instruction. [¶] Therefore, as a matter of law, Mr. Robinson's not entitled to the relief under Penal Code [s]ection 1170. 95 [now section 1172.6] with respect to a prima facie finding. The Court is going to deny the petition at this time." Defendant timely appealed.

## III.

## DISCUSSION

Defendant contends the trial court erred in summarily denying his petition because the available record of conviction suggested his allegations had potential merit, satisfying the prima facie standard applicable under section 1172.6. The People respond that the trial court correctly concluded defendant was ineligible for relief as a matter of law because the jury was not instructed on the natural and probable consequences doctrine or on any other theory of murder in which malice is imputed based solely on participation in a crime.

A. *Legal Background*

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 "'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to

11

murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'" (*People v. Gentile* (2020) 10 Cal.5th 830, 846-847; see Stats. 2018, ch. 1015, § 1, subd. (f).) The Legislature accomplished this by amending sections 188 and 189.

Section 188, which defines malice, now provides in part: "Except as stated in subdivision (e) of [s]ection 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3); Stats. 2018, ch. 1015, § 2.)

Section 189, subdivision (e), now limits the circumstances under which a person may be convicted of felony murder: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) [defining first degree murder] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [s]ection 190.2." (Stats. 2018, ch. 1015, § 3.)

Effective January 1, 2022, Senate Bill No. 775 expanded eligibility for relief to include individuals convicted of attempted "murder under the natural and probable

12

consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime." (§ 1172.6, subd. (a), as amended by Stats. 2021, ch. 551, § 2; Legis. Counsel's Dig., Sen. Bill No. 775 (2020-2021 Reg. Sess.).) But it did not expand eligibility for relief pursuant to section 1172.6 to one who directly aids and abets another who commits murder or attempted murder.

Senate Bill No. 1437 also created a procedure for offenders previously convicted of felony murder or murder under the natural and probable consequences doctrine to seek retroactive relief if they could no longer be convicted of murder under the new law. (§ 1172.6, subd. (a); *People v. Gentile*, *supra*, 10 Cal.5th at p. 843; *People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*); *People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*).) "[T]he process begins with the filing of a petition containing a declaration that all requirements for eligibility are met [citation], including that '[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to . . . [s]ection 188 or 189 made effective January 1, 2019' . . . ." (*Strong*, *supra*, at p. 708.) "When the trial court receives a petition containing the necessary declaration and other required information, the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' [Citations.] If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition." (*Ibid.*)

In *Lewis*, *supra*, 11 Cal.5th 952, our Supreme Court explained the trial court's role in deciding a section 1172.6 petition: Petitioners who request counsel "are entitled to the

appointment of counsel upon the filing of a facially sufficient petition . . . ." (*Id.* at p. 957.)[7] "[O]nly after the appointment of counsel and the opportunity for briefing may the superior court consider the record of conviction to determine whether 'the petitioner makes a prima facie showing that he or she is entitled to relief.'" (*Ibid.*, italics omitted; see *id.* at p. 966 ["a complying petition is filed; the court appoints counsel, if requested; the issue is briefed; and then the court makes [its] prima facie determination"].) The court's "prima facie inquiry . . . is limited. . . . '"[T]he court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause."' [Citation.] '[A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.'" (*Id.* at p. 971.) Importantly, "[i]n reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.'" (*Id.* at p. 972.) The court further concluded that a trial court's failure to follow the procedures enacted in section 1172.6 is analyzed for prejudice under the state law standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. (*Lewis*, *supra*, at pp. 973-974.) Under this standard, we ask whether it is reasonably probable defendant would have obtained a more favorable outcome if counsel proper procedures had been followed. (*Id.* at p. 974.)

---

[7] In Senate Bill No. 775, the Legislature amended the language of section 1172.6, codifying *Lewis*, *supra*, 11 Cal.5th 952, expanding the scope of the petitioning process and clarifying some of the procedural requirements. (Stats. 2021, ch. 551, § 2.)

If a petitioner has made a prima facie showing of entitlement to relief, "'the court shall issue an order to show cause.'" (*Strong*, *supra*, 13 Cal.5th at p. 708.) Once the court determines that a defendant has made a prima facie showing, it "must [then] hold an evidentiary hearing at which the prosecution bears the burden of proving, 'beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder' under state law as amended by Senate Bill [No.] 1437. [Citation.] 'A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' [Citation.] 'If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges.'" (*Strong*, *supra*, at p. 709; accord, *Lewis*, *supra*, 11 Cal.5th at p. 960.) "Senate Bill [No.] 1437 relief is unavailable if the defendant was either the actual killer, acted with the intent to kill, or 'was a major participant in the underlying felony and acted with reckless indifference to human life . . . .'" (*Strong*, *supra*, at p. 710.)

B. *Standard of Review*

In this case, the trial court denied defendant's petition at the prima facie stage under section 1172.6, subdivision (c). A denial at this stage is appropriate only if the record of conviction demonstrates that the petitioner is ineligible for relief as a matter of law. (*Lewis*, *supra*, 11 Cal.5th at p. 960.) This is a purely legal conclusion, which we review de novo. (See *id*. at p. 961.)

15

C. *Analysis*

The trial court here properly relied on defendant's record of conviction, including the jury instructions, to discern defendant's ineligibility as a matter of law at the prima facie stage. As our Supreme Court has stated, "the parties can, and should, use the record of conviction to aid the trial court in reliably assessing whether a petitioner has made a prima facie case for relief under [section 1172.6,] subdivision (c)," but cannot "engage in 'factfinding involving the weighing of evidence or the exercise of discretion.'" (*Lewis*, *supra*, 11 Cal.5th at p. 972.) The trial court here did not weigh evidence or exercise any discretion. Rather, the court explained the jury instructions given at defendant's trial. Discerning what instructions were given is not weighing evidence. (See, e.g., *People v. Coley* (2022) 77 Cal.App.5th 539, 546-547 (*Coley*) [analyzing jury instructions to determine prima facie eligibility]; *People v. Garcia* (2022) 76 Cal.App.5th 887, 894-895 [same].)

Here, defendant's record of conviction shows that he was either the actual killer or directly aided and abetted in the attempted murder and that he acted with the specific intent to kill. The jury instructions given at defendant's trial did not allow defendant to be convicted based upon imputed malice but a showing of actual malice as the actual killer or as an aider or abettor. At trial, the jury was instructed on premeditated attempted murder pursuant to CALCRIM Nos. 600 and 601. CALCRIM No. 600 instructed the jury that an attempted murder conviction required that the "'defendant intended to kill that person.'" The jury convicted defendant of willful, deliberate and premeditated

16

murder which stated in relevant part, "'The defendants acted willfully if they intended to kill when they acted.'" The instruction further instructed, "'The attempted murder was done willfully and with deliberation and premeditation if either of the defendants or both of them acted with that state of mind.'"

The court also instructed the jury pursuant to CALCRIM No. 400 on general aiding and abetting principles as follows: "'A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator who directly committed the crime. A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it.'" The jury was also instructed on CALCRIM No. 401, the direct aiding and abetting instruction, which provided in pertinent part: "'To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] And [¶] 4. The defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.'"

17

While the amendment to section 188 effectively eliminated use of the natural and probable consequences doctrine to support a murder or attempted murder conviction, the change did not "alter the law regarding the criminal liability of direct aiders and abettors of murder because such persons necessarily 'know and share the murderous intent of the actual perpetrator.'" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118; see *People v. Chiu* (2014) 59 Cal.4th 155, 167 [a direct aider and abettor "acts with the mens rea required for first degree murder"].) Hence, a direct aider and abettor can be convicted of murder notwithstanding the amendments to sections 188 and 189, which changed nothing with regard to direct aider and abettor liability. Defendant was required to make a prima facie showing that he was not convicted as a perpetrator or direct aider and abettor, and thereby "'"falls within the provisions of" the statute.'" (*Lewis*, *supra*, 11 Cal.5th at p. 961; § 1172.6, subds. (a)(3) & (c).) He failed to do so.

The jury was not instructed with CALCRIM Nos. 402 or 403 on the natural and probable consequences doctrine. In addition, the jury was not instructed on felony murder, or any other theory of liability that would have permitted the jury to impute malice to defendant. Rather, the instructions were limited to direct aiding and abetting, express and implied malice, and premeditation and deliberation. And during closing argument, the prosecutor argued that defendant either committed attempted murder as either a direct perpetrator or a direct aider and abettor. Although the jury was unable to reach a true finding as to the willful, deliberate and premeditated allegation as to defendant's codefendant, the jury *did* return a true finding defendant committed the

18

attempted murder with premeditation and deliberation. Thus, contrary to defendant's argument, here the jury certainly found defendant acted with the necessary mental state.

*Coley*, *supra*, 77 Cal.App.5th 539 is instructive. The defendant in *Coley* was convicted of second degree murder and attempted murder and appealed the denial of his petition for resentencing under section 1172.6. (*Coley*, *supra*, at pp. 541-542.) The trial court concluded that the record of conviction showed the jury had found express malice, i.e., a specific intent to unlawfully kill, when it convicted the defendant of attempted murder, and therefore denied the petition. (*Id*. at p. 545.) The Court of Appeal affirmed, concluding that the defendant's conviction for attempted murder "demonstrates that he was convicted of second degree murder with express rather than implied malice." (*Id*. at p. 547.) The court explained that the defendant was "convicted of murder based on his aiding and abetting of the same shooting that gave rise to the attempted murder conviction" and that "[t]he jury was instructed by CALCRIM No. 600 that attempted murder requires a determination that 'the defendants intended to kill that person.'" (*Ibid*.) "[B]y finding [the defendant] guilty of attempted murder, the jury necessarily found he had personally harbored intent to kill or express malice when he aided and abetted the second degree murder." (*Ibid*.)

Defendant contends the trial court's reliance on *Coley* was misplaced because the jury in *Coley*, unlike the jury here, found true that the defendant was a principal who personally and intentionally discharged a firearm causing great bodily injury or death. We disagree. As in *Coley*, *supra*, 77 Cal.App.5th 539, defendant's conviction for

19

premeditated attempted murder demonstrates that defendant acted with express rather than implied malice.

According to the plain language of section 1172.6, a person convicted of attempted murder is eligible for relief only if that conviction was based on the natural and probable consequences doctrine.  (*Coley*, *supra*, 77 Cal.App.5th at p. 548 ["Section [1172.6] applies by its terms only to attempted murders based on the natural and probable consequences doctrine"].)  Where, as in this case, the instructions did not permit the jury to convict defendant of "attempted murder under the natural and probable consequences doctrine" (§ 1172.6, subd. (a)), defendant is ineligible for relief under section 1172.6 as a matter of law.  (*Coley*, *supra*, at p. 548 [defendant convicted of attempted murder not entitled to § 1172.6 relief because the jury was not instructed on the natural and probable consequences doctrine]; see also *People v. Offley* (2020) 48 Cal.App.5th 588, 599 ["if the jury did not receive an instruction on the natural and probable consequences doctrine, the jury could not have convicted the defendant on that basis, and the petition should be summarily denied"].)

Defendant's reliance on *People v. Langi* (2022) 73 Cal.App.5th 972 (*Langi*)—which he cites to contend the jury could have convicted him of attempted murder as an aider and abettor without finding he personally acted with malice—is misplaced.  In *Langi*, the defendant was convicted of second degree murder as an aider and abettor based on his participation in a fistfight among several people, in which the victim was

20

punched in the face, fell, and hit the back of his head on the sidewalk or curb, resulting in the victim's death. (*Id*. at pp. 975, 976-977.)

On appeal from the summary denial of the defendant's section 1172.6 petition, the Court of Appeal concluded that the instruction on aiding and abetting (CALJIC No. 3.01) creates an ambiguity in the context of second degree implied malice murder, which may allow the jury to "find the defendant guilty of aiding and abetting second degree murder without finding that he personally acted with malice." (*Langi*, *supra*, 73 Cal.App.5th at p. 982.) The court explained, "The aiding-and-abetting instruction stated that a person aids and abets a crime if he or she acts '*with knowledge of the unlawful purpose of the perpetrator*, and . . . with the intent or purpose of committing or encouraging or facilitating the commission of the crime.' (CALJIC No. 3.01, italics added.) However, . . . the second degree murder instruction specified that the direct perpetrator of that crime need not act with the unlawful intent of causing death. . . . If the perpetrator need not have had 'murderous intent,' certainly the aider and abettor need not have had such an intent. Although the definition of second degree murder in CALJIC No. 8.31 states that the perpetrator must have acted with conscious disregard for human life, the definition of an aider and abettor in CALJIC No. 3.01 does not include the same requirement." (*Langi*, *supra*, at pp. 982-983.) In this situation, the ambiguity in the instructions allows an aider and abettor to be found guilty simply for intending to aid the perpetrator's act, without personally and consciously disregarding the danger to human life. (*Id*. at p. 983.)

21

*Langi* is inapposite because defendant was not convicted of second degree or implied malice murder, but rather, premeditated attempted murder. In contrast to second degree implied malice murder, the perpetrator of an attempted murder must have the specific intent to unlawfully kill another human being. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890 ["'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing'"].) Because, as set forth above, an aider and abettor to attempted murder shares the perpetrator's intent to kill, the possibility of imputing malice to an aider and abettor identified in *Langi* is not present where the defendant is convicted of attempted murder as an aider and abettor. (See *Coley*, *supra*, 77 Cal.App.5th at pp. 547-548 [*Langi* inapplicable where attempted murder conviction based on jury instructions requiring intent to kill].)

Defendant further argues he set forth a prima facie case because the court instructed the jury on aiding and abetting with the former version of CALCRIM No. 400, which used the now invalidated "equally guilty" language that has since been found to potentially mislead a jury into equating an aider and abettor's mental state with that of the perpetrator's without making an independent factual finding regarding the aider and abettor's intent to kill.

The "equally guilty" language in CALCRIM No. 400 did not allow the jury to find defendant guilty of attempted murder without considering defendant's own mental state. (See *People v. Johnson* (2016) 62 Cal.4th 600, 638-641.) In *Johnson*, our Supreme Court

rejected the argument that CALCRIM former No. 400's "equally guilty" language allows a jury to convict an aider and abettor of first degree murder based on the perpetrator's culpability without considering the aider and abettor's own mental state. (*Id.* at pp. 638, 641.) The court held that where the jury was instructed with CALCRIM No. 401 setting forth the requirements for establishing aider and abettor liability, "there was no reasonable likelihood the jurors would have understood the 'equally guilty' language in CALCRIM former No. 400 to allow them to base defendant's liability for first degree murder on the mental state of the actual shooter, rather than on defendant's own mental state in aiding and abetting the killing." (*Id.* at p. 641; *People v. Estrada* (2022) 77 Cal.App.5th 941, 947.) In this case, the jury was instructed with both CALCRIM Nos. 400 and 401.

Defendant further argues that CALCRIM No. 401 did not negate the danger of imputed malice in this case because "the jury was demonstrably confused about whether it had to find all the required elements of aiding and abetting to find a defendant guilty" as based on their questions during deliberations. The jury here asked the following three questions: "Can you please help clarify all the components of aiding and abetting," "Do the defendants need to meet all 4 criteria of aiding and abetting to be considered guilty," and "Does either of the defendants presented in this trial have to be the perpetrator." To each question, the court instructed the jury to refer to CALCRIM Nos. 400 and 401. It is presumed that the jury followed the trial court's instructions unless the record affirmatively indicates otherwise. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1,

23

83.)  Here, there was no evidence that the jury did not understand the court's response or did not follow the court's instructions.  We further reject defendant's speculative claims that the gang enhancement allegation instructions might have caused the jury to reach a compromise verdict on what was otherwise a fairly weak case.

In sum, the jury's verdict and the jury instructions show as a matter of law that defendant was convicted as a perpetrator or a direct aider and abettor, and therefore was convicted under a theory of murder that still remains valid after Senate Bill No. 1437.  Accordingly, the trial court did not err in denying defendant's petition for resentencing.

IV.

DISPOSITION

The order denying defendant's section 1172.6 petition is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

RAPHAEL
J.